UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AXA INSURANCE CO., a/s/o Technicolor Home Entertainment Services, Inc. and Technicolor USA, Inc.; TECHNICOLOR HOME ENTERTAINMENT SERVICES, INC.; and TECHNICOLOR USA, INC.; <br><br> Plaintiffs, <br><br> - v. - <br><br> TMG TRANSPORT MANAGEMENT GROUP, INC., f/k/a Flynn Transportation Services, Inc.; BIRDDOG LOGISTICS, LLC, f/k/a CHTL Logistics, LLC, individually and as successor in interest of TMG Transport Management Group, Inc.; and TRANSPORTATION INSIGHT, LLC, as successor in interest of TMG Transport Management Group, Inc. f/k/a Flynn Transportation Services, Inc.; <br><br> Defendants. | 18 Civ. _____ <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs, Axa Insurance Co. ("Axa"), Technicolor Home Entertainment Services, Inc. ("Technicolor HES"), and Technicolor USA, Inc. ("Technicolor USA"), by and through their undersigned counsel, allege upon information and belief as follows:

INTRODUCTION

1. This breach-of-contract action arises from the in-transit theft of 52,170 video game discs ("Discs"), owned by Technicolor HES and Technicolor USA (collectively "Technicolor") and insured by Axa, during the Discs' inland motor carriage from Memphis, Tennessee to La Vergne, Tennessee ("Theft"). Technicolor hired TMG Transport Management Group, Inc., f/k/a Flynn Transportation Services, Inc., ("Flynn"); Birddog Logistics, LLC, f/k/a CHTL Logistics, LLC, ("BDL"); and Transportation Insight, LLC ("Insight") (collectively "Defendants") to arrange said carriage pursuant to a 2011 Contract Carrier Agreement

("Agreement").  In the Agreement, Defendants assumed responsibility for, *inter alia*, in-transit loss of or damage to Technicolor cargos.  And because the Theft occurred while the Discs were in the custody of the inland carrier appointed by Defendants, G&S Carriers, Inc. ("GSC"), Defendants are liable for the Discs' Theft.

## PARTIES

2.      Technicolor HES was and is a Delaware corporation with an office for the transaction of business at 3233 East Mission Oaks Boulevard, Camarillo, California 93102.

3.      Technicolor USA was and is a Delaware corporation with an office for the transaction of business at 101 West 103rd Street Indianapolis, Indiana 46290.

4.      Technicolor HES and Technicolor USA are related technology companies that, *inter alia*, manufacture, package, and distribute video game discs for leading software content providers.  Technicolor HES and Technicolor USA manufactured and owned the Discs, subject to certain licensed rights contained therein.

5.      Axa was and is a New York corporation with an office for the transaction of business at 125 Broad Street, New York, New York 10004.

6.      Axa insured the Discs, paid Technicolor's losses resulting from the Theft (less Technicolor's deductible), and thereby became subrogated to Technicolor's rights to the extent of said payment.

7.      Axa and Technicolor bring this action on their own behalves and as agents or trustees on behalf of all having an interest in the Discs.

8.      Flynn was and is a Florida corporation with an office for the transaction of business at 2400 Executive Street, Charlotte, North Carolina 28266.

9. Flynn was registered with the U.S. Department of Transportation ("DOT") as an interstate carrier (DOT Number 675354).

10. BDL was and is a North Carolina limited liability company with an office for the transaction of business at 310 Main Avenue Way SE, Hickory, North Carolina 28602.

11. BDL was and is registered with the DOT as an interstate carrier (DOT Number 924132).

12. BDL is a successor in interest of Flynn.

13. Insight was and is a North Carolina limited liability company with an office for the transaction of business at 310 Main Avenue Way SE, Hickory, North Carolina 28602.

14. Insight was and is registered with the DOT as an interstate carrier with DOT Number 2434826.

15. Insight is a successor in interest of Flynn.

## JURISDICTION & VENUE

16. This Honorable Court has jurisdiction over the subject matter of this action by virtue of 28 U.S.C. § 1332(a)(1) because the matter in controversy is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

17. This Honorable Court has personal jurisdiction over Defendants and venue in this District is proper pursuant to the forum-selection clause in the Agreement.

## FACTS

*The Flynn-Technicolor Agreement*

18. On or about 10 October 2011, Technicolor and Flynn entered the Agreement and a Statement of Work ("2011 SOW"), which together laid out those Parties'

respective rights and responsibilities relating to the transport and handling of Technicolor's and Technicolor's customers' cargos.

19. A true and accurate copy of the Agreement is attached hereto as Exhibit 1.

20. In 2013, Technicolor and Flynn replaced the 2011 SOW with a subsequent version ("2013 SOW") and did the same the following year ("2014 SOW").

21. In 2015, rather than issue a "2015 SOW," Technicolor and Flynn added an amendment to the Agreement, which reanimated the 2013 SOW save for the substitution of a revised Rate Schedule ("Revised SOW").

22. The Revised SOW, a true and accurate copy of which is attached hereto as Exhibit 2, was in effect at the time the Discs were stolen.

23. In the Agreement and Revised SOW, Flynn agreed to "arrang[e] transportation [of Technicolor's goods] via qualified contract carriers" to various North American locations "efficiently and in a professional manner consistent with the highest standards in the industry" and with "due care and diligence." Agreement, Second Introductory Paragraph, Clauses 1 and 3, p. 1; Revised SOW Clauses 6.0.1, 11.1, 11.4.

24. In the Agreement, Flynn contractually assumed responsibility for safe carriage of Technicolor's property in exchange for Technicolor's commitment to "utilize [Flynn] on a non-exclusive basis to perform transportation and logistic services." Agreement, Whereas Clauses and Clause 1; see also Revised SOW Clauses 6.0.1, 11.1, 11.4, 18, 19.

25. In the Agreement, "the [P]arties . . . expressly agree[d] that [Flynn] [would] be liable to Technicolor for loss, damage, or injury to the commodities transported under this Agreement which occurs while in the possession or under the control of [Flynn] which results from [Flynn's] performance or failure to perform the services provided for [under the Agreement], to

the extent such loss or damage [wa]s proximately caused by the negligence of [Flynn], its employees or its agents." Agreement, Clause 18.

26. In the Revised SOW, the Parties agreed that "[Flynn] shall be liable for any damages; if it is determined that [Flynn] caused the damage, incurred to the property while performing pickup or delivery services . . . ." 2013 SOW, Clause 11.4(F).

27. In the Agreement, the Parties agreed that, "[a]t a minimum, [Flynn] [would] insure [Technicolor's] freight" for "one hundred thousand dollars" for any one trailer load.

28. However, the Parties also agreed (1) that Flynn's procurement of cargo insurance would not "limit[] [its] liability;" (2) that Flynn would remain "liable for all loss of . . . [Technicolor's] freight, including but not limited to any products while such freight is under [Flynn's] or its employees' or agent's custody or carrier's control or possession or if the loss . . . occurs during national transportation;" and (3) that Flynn would remain obligated to "reimburse Technicolor for all loss related to . . . the freight." Agreement, Clause 17(C).

29. In the Agreement and Revised SOW, Flynn agreed "to comply with the Technicolor Global Transportation Security Policy" ("Security Policy"), "ensure that all subcontracted carriers comply with such security policies," and confirm said agreement "in writing [with] [said] subcontractors." Agreement, Clause 16; 2013 SOW Clauses 6.0.1, 11.1, 11.4.

30. In pertinent part, Technicolor's Security Policy required that Flynn and all of its subcontractors to (1) employ driver teams for high-value cargo (such as the Discs) so that such cargo was never left unattended; (2) keep a Technicolor dispatcher constantly advised of any in-transit stops while confirming the security of the cargo; (3) ensure that any containers (laden or unladen) were stored in secured, surveilled areas that would prevent unauthorized access thereto; (4) not allow private passenger vehicles to park near any cargo storage area; (5) ensure that all

tractors and trailers used to transport Technicolor's cargo were equipped with global positioning systems ("GPS").

31. In the Agreement, the Parties also agreed that "[t]he prevailing party in any legal action or proceeding . . . [would] be entitled . . . to reimbursement for its expenses, including court costs and reasonable attorneys' fees." Agreement, Clause 22.

*Insight Acquires BDL and Flynn*

32. In early 2016, Insight acquired Flynn and BDL.

33. As will be discussed, Flynn and BDL arranged the subject shipment during which the Theft occurred.

34. As a principal to the Agreement and Revised SOW, Flynn was bound to perform in accordance therewith is liable for any actionable breach thereof.

35. As Flynn's successors in interest, BDL and Insight were bound to perform in accordance with the Agreement and Revised SOW and are liable for any actionable breach thereof.

36. Accordingly, Flynn, BDL, and Insight will hereafter be referred to collectively as Defendants.

*The Subject Shipment & Theft*

37. In August 2016, Bethesda Softworks ("Bethesda") and ZeniMax Online Studios ("ZeniMax") hired Technicolor to manufacture, package, and distribute the Discs.

38. Technicolor manufactured the Discs at its Guadalajara, Mexico facility and then shipped them to its Memphis facility for packaging.

39. Technicolor hired Defendants, pursuant to the Agreement, to arrange the transport of the Discs from Technicolor's Memphis packaging facility to the La Vergne, Tennessee

facility of its sister company, Cinram Group, Inc. ("Cinram"), for eventual retail distribution across North America.

40. Defendants, in turn, hired motor carrier GSC to carry the Discs from Memphis to La Vergne pursuant to a Broker-Carrier Contract that GSC maintained with BDL ("Carrier Contract").

41. The Carrier Contract provided that GSC's performance would be governed by the Carmack Amendment, 49 U.S.C. § 14706, and any additional terms established by any load confirmation issued in conjunction a particular shipment.

42. On or about 23 August 2016, BDL issued a Load Confirmation that instructed GSC to pick-up the Discs in Memphis at 8:00 p.m. on 23 August 2016 and deliver them to La Vergne at 8:00 a.m. the following morning.

43. The Load Confirmation also provided, in pertinent part, as follows:

TRUCK AND/OR TRAILER MUST HAVE GPS TRACKING! NO EXCEPTIONS!! TRAILER CANNOT BE LEFT UNATTENDED OR DROPPED WITHOUT PRIOR WRITTEN CONSENT FROM [BDL] . . . . FAILURE TO COMPLY WITH THE ABOVE REQUIREMENTS MAY LEAD TO A FINE AND/OR CLAIM. **MUST BE TECHNICOLOR APPROVED CARRIER**

44. Defendants issued no other instructions to GSC.

45. Defendants never provided GSC with Technicolor's Security Policy.

46. Defendants never procured GSC's written agreement to abide Technicolor's Security Policy.

47. On or about 23 August 2016, GSC's driver, Avery Thompson ("Thompson"), picked up the Discs and countersigned Bill of Lading No. H83364, confirming

GSC's receipt of Lot Nos. ZB1711 (47,250 Discs); ZB1712 (3,000 Discs), and ZB1713 (1,920 Discs).

48. After the Discs had been loaded into GSC's trailer, Thompson departed Technicolor's facility.

49. Neither the GSC tractor nor the GSC trailer transporting the Discs were equipped with GPS.

50. On or about 23 August 2016, Thompson – abiding the instructions of GSC's owner, Charles Gilmore ("Gilmore") – drove GSC's tractor and trailer to a parking spot near 46 Timbercreek Road in Memphis.

51. Thompson parked the GSC tractor and trailer there at approximately 9:30 p.m. and then drove his personal vehicle home.

52. Gilmore was to complete the delivery of the Discs the following morning because Thompson had to carry another load to a separate destination at 3:30 a.m. the following morning.

53. On or about 24 August 2016, at approximately 3:30 a.m., Thompson returned to the area in which he had parked the subject GSC tractor and trailer to pick up that other load and discovered that the subject tractor and trailer had been stolen.

54. Thompson advised Gilmore of the theft, and Gilmore notified the authorities.

55. To date, the Discs have not been recovered.

56. Technicolor submitted a claim to Axa for its losses, and Axa paid Technicolor $561,375.60 ($118,139 for Technicolor's lost revenue + $491,520 for replacement Discs) to settle the claim.

57. Technicolor retains uninsured losses or exposure totaling $22,453.40 ($10,933.40 deductible + $11,520 in disputed royalty charges owed by Bethesda to Microsoft).

## CAUSE OF ACTION:
### BREACH OF THE AGREEMENT

58. Paragraphs 1 through 57 are incorporated by reference as though fully set forth at length herein.

59. The Agreement is valid, binding, and enforceable contract.

60. Technicolor fully performed its obligation under the Agreement by, *inter alia*, paying Defendants the agreed upon fees for their services.

61. Defendants breached the Agreement by failing to appoint a "qualified contract carrier[]" to carry the Discs.

62. Defendants breached the Agreement by failing to transport the Discs "efficiently and in a professional manner consistent with the highest standards in the industry."

63. Defendants breached the Agreement by failing to exercise "due care and diligence" in arranging the Discs' carriage.

64. Defendants breached the Agreement by failing (a) to comply with Technicolor's Security Policy, (b) to ensure that GSC complied with Technicolor's Security Policy (since they never provided GSC with said Policy), and (c) to procure GSC's written agreement to abide Technicolor's Security Policy.

65. Defendants breached the Agreement by failing to (1) employ a driver team for the subject shipment; (2) ensure that the Discs were never left unattended; (2) keep a Technicolor dispatcher constantly advised of any in-transit stops while confirming the security of the Discs; (3) ensure that GSC's tractor and the trailer it used to carry the Disc were stored in

secured, surveilled area; (4) ensure that GSC's tractor and the trailer it used to carry the Disc were equipped with GPS.

66.    As a direct and proximate cause of Defendants' breaches, the Discs were allowed to be stolen, causing Plaintiffs to sustain damages, as nearly as can now be determined, no part of which has been paid although duly demanded, in the principal amount of $583,829.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants in the sum of $583,829, plus interests, costs, disbursements, attorneys' fees and such other and further relief this Court deems just and proper.

Dated:  March 23. 2018                    MATTHEWS LAW FIRM, INC.

By: _____
    ARTURO E. MATTHEWS, JR. (SBN: 145232)
    MATTHEWS LAW FIRM, INC.
    2512 Chambers Road, Suite 105
    Tustin, CA 92780
    Tel (714) 647-7110
    Fax (714) 647-5558
    Email: aem@matthewsfirm.net

    ATTORNEY FOR PLAINTIFF

## JURY DEMAND

Plaintiffs, Axa Insurance Co. ("Axa"), Technicolor Home Entertainment Services, Inc. ("Technicolor HES"), and Technicolor USA, Inc. ("Technicolor USA"), by and through their undersigned counsel, hereby demand, pursuant to Fed.R.Civ.P. 38, trial by jury in this action of all issues so triable.

Dated:  March 23. 2018                                MATTHEWS LAW FIRM, INC.

By: _____
ARTURO E. MATTHEWS, JR. (SBN: 145232)
MATTHEWS LAW FIRM, INC.
2512 Chambers Road, Suite 105
Tustin, CA 92780
Tel (714) 647-7110
Fax (714) 647-5558
Email: aem@matthewsfirm.net

ATTORNEY FOR PLAINTIFF